UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
IN RE THE APPLICATION OF:                     )
                                              )
FEDERICO MENDEZ,                              )
                                              )
         Petitioner,                          )
                                              )
v.                                            )          Civil No. 14-13747-LTS
                                              )
MAYA K. MAY,                                  )
                                              )
         Respondent.                          )
_____)

FINDINGS OF FACT AND CONLUSIONS OF LAW

January 12, 2015

The petitioner, Federico Mendez ("Mr. Mendez"), has filed this petition pursuant to the

Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670,

1343 U.N.T.S. 89 ("the Hague Convention") and the International Child Abduction Remedies

Act, 22 U.S.C. §§ 9001-9011 ("ICARA"). The petitioner is the father of C.F.F.M. ("C.F.F.M."

or "the child"), a minor child. The respondent, Maya May ("Ms. May"), is C.F.F.M.'s mother.

Mr. Mendez seeks the return of C.F.F.M. to Argentina from Massachusetts.

The Court held an evidentiary hearing on this matter over the course of three days from

December 15, 2014 to December 17, 2014. For the reasons set forth below, the Court finds that

Mr. Mendez has established a prima facie case for wrongful removal and that Ms. May has not

established any of the affirmative defenses to return. Accordingly, the petition for return of

C.F.F.M. is GRANTED.

I.    FINDINGS OF FACT

A.    Ms. May and Mr. Mendez's Romantic Relationship

1.  Mr. Mendez was born and raised in Argentina.  He is a citizen of Argentina.  He is not a citizen or permanent resident of the United States, nor has he ever held such a status.  Much of his family resides in Buenos Aires.

2.  Ms. May is a United States citizen.  She is also a permanent resident of Argentina.

3.  Ms. May and Mr. Mendez met in 2005 in Argentina and began dating thereafter.  For a time while they were dating they lived in the United States, however, they settled in Buenos Aires, Argentina in 2006.

4.  After they moved to Buenos Aires, they lived together in an apartment on Peru Street in Buenos Aires.[1]

5.  Ms. May and Mr. Mendez never married.

B.    The Birth of C.F.F.M.

6.  C.F.F.M. was born in Buenos Aires on December 3, 2007.  Pet'r Ex. 5.[2]  The birth certificate lists Ms. May and Mr. Mendez as the child's parents.  Id.

7.  Ms. May and Mr. Mendez lived with the child in the apartment on Peru Street from C.F.F.M.'s birth until 2009.

8.  The child is a citizen of both Argentina and the United States and holds passports from both countries.  Pet'r Ex. 17.

---

[1] The parties are in a substantial dispute over the ownership of the Peru Street property, a dispute that is not relevant to the resolution of this matter except insofar as the parties' statements may tangentially bear on credibility.

[2] The parties submitted separately numbered exhibit binders for the hearing in this matter.  Accordingly, citations to the record specify the binder in which the referenced exhibit is found.  The exhibits are not uniformly paginated and thus page references are to bates numbering, if available, or, if not, to the internal pagination of the referenced document.

9.  On March 12, 2008, Ms. May and Mr. Mendez executed a travel authorization that
    allowed either parent to travel internationally with the child.  Pet'r Ex. 6.  This
    authorization allowed the child to leave the country with only one parent, with the
    authorization attesting to the consent of the other parent.  Id.  This travel authorization
    was open-ended, that is, it was effective until the child turned eighteen.  Id.

C.  The End of Ms. May and Mr. Mendez's Romantic Relationship

10. Ms. May and Mr. Mendez ended their romantic relationship in the first half of 2009.
    After the relationship ended, Ms. May and the child continued to reside in the Peru Street
    apartment, while Mr. Mendez resided elsewhere in Buenos Aires.

11. On July 1, 2009, the parties, after a mediation, reached an agreement on child custody
    and support issues.  Pet'r Ex. 7.  The 2009 agreement provided, in part, that the child
    would reside with Ms. May and that Mr. Mendez would have weekly visitation during
    which he would pick the child up on Thursday evenings and return him on Sunday
    evenings.  Id. at 001.  The agreement allowed Ms. May to travel to the United States for
    up to fifteen days during the Argentine winter and for up to forty-five days during the
    Argentine summer.  Id. at 002.  The 2009 agreement required Mr. Mendez to grant travel
    authorizations as necessary to permit Ms. May to travel out of Argentina pursuant to the
    agreement.  Id.

12. The child attended school in Buenos Aires beginning in 2010.  The child attended the
    same school from 2010 through the end of the Argentine school year in December 2013.
    Pet'r Ex. 36 at 002.

D.    Difficulties in Ms. May and Mr. Mendez's Parenting Relationship

13. In 2011, there was an altercation between Ms. May and Mr. Mendez.  This incident occurred in the hallway of the Peru Street apartment where Ms. May was living with the child at the time.  Earlier on the same day, Ms. May and the child had just returned from a forty-five day trip to the United States.  Although the day was not one on which Mr. Mendez was entitled to visitation under the parties' 2009 agreement, he appeared at Ms. May's home unannounced hoping to see the child.  At the front door, Ms. May told Mr. Mendez that it was not a convenient time and asked him to come back the next day.  Mr. Mendez refused, and he pushed his way past Ms. May into the corridor of the apartment in an effort to see the child within the apartment.  In the course of this confrontation, Mr. Mendez pushed Ms. May to the ground, according to Ms. May's testimony.  Ultimately, Mr. Mendez left without seeing the child.

14. In November of 2011, another altercation occurred.  Mr. Mendez picked up the child for his visitation at which point Ms. May requested that Mr. Mendez give her a ride to the subway, and Mr. Mendez agreed.  During the course of the car ride, Ms. May and Mr. Mendez began arguing.  The argument in the car erupted into a yelling match outside of the car.  The child was present for this altercation.  During this exchange, Mr. Mendez referred to Ms. May as "basura," a Spanish word meaning "trash."  Eventually, Mr. Mendez locked Ms. May out of the car and drove away with the child.  Ms. May testified that, during the argument, Mr. Mendez attempted to push her out of his car while it was moving.  Mr. Mendez denied doing this and testified that Ms. May tried to jump out of the moving car with the child.

15. In response to this altercation, Ms. May, on her own, denied Mr. Mendez visitation for a period of about four months.  At some point, Mr. Mendez sought judicial intervention to restore visitation.  Thereafter, the court intervened to reestablish Mr. Mendez's visitation. Pet'r Ex. 53.

16. In addition to Mr. Mendez's civil complaint for denial of visitation, after the incident in Mr. Mendez's car, both he and Ms. May filed domestic violence complaints against each other.  In response to these complaints, a body known as the Interdisciplinary Board of Protection against Family Violence interviewed both Ms. May and Mr. Mendez and conducted home visits when the child was present at both residences.  Resp't Ex. 16 at 10-15.  The body issued a report which found that Ms. May had been a victim of physical and psychological violence and that the child had been a victim of Mr. Mendez's actions insofar as he had witnessed the interaction between Ms. May and Mr. Mendez.  Id. at 15-16.

17. In February 2011, Mr. Mendez revoked the 2008 travel authorization that allowed the child to leave Argentina with Ms. May.  Pet'r Ex. 9.  Mr. Mendez notified Ms. May of this by certified letter.  Id.

18. Thereafter, Mr. Mendez and Ms. May executed trip-specific authorizations for each time Ms. May traveled abroad with the child.  E.g., Pet'r Ex. 11 at 002.

19. In December 2012, Mr. Mendez and Ms. May executed a new agreement regulating their relationship as parents.  Pet'r Ex. 16.  Under the 2012 agreement, Ms. May maintained custody of the child.  Id. at 007.  The 2012 agreement, however, made two reductions in Mr. Mendez's visitation schedule.  Although Mr. Mendez generally maintained weekend visitations, under the 2012 agreement, Mr. Mendez picked up the child on Friday

evenings (instead of Thursday evenings) and returned him on Sunday evenings.  Id.  In addition, under the 2012 agreement, the child stayed with Ms. May on the first weekend of the month and Mr. Mendez had visitation on the Mondays following the weekends when the child stayed with Ms. May.  Id.  The 2012 agreement allowed Ms. May to travel abroad with the child up to forty-five days each year and required Mr. Mendez to grant his consent as needed for these trips on a trip-by-trip basis.  Id.

E.      Ms. May's Intent to Relocate

20. In the spring of 2013, Ms. May began to consider leaving Argentina to pursue work in other countries due to the poor economy and decline in tourism in Argentina.

21. At this time, Ms. May discussed with Mr. Mendez her interest in relocating outside of Argentina with the child.  This was not the first time Ms. May had raised such an interest; the parties had various discussions prior to this time about Ms. May relocating out of the country.

22.  These talks continued sporadically throughout the spring and early summer, although no agreement was reached at that time.  Mr. Mendez opposed Ms. May relocating with the child during this period.

F.      Conversations between Ms. May and Mr. Mendez about Relocating

23. In July 2013, Ms. May and Mr. Mendez attended a mediation session in an effort to reach an agreement regarding Ms. May's interest in moving to the United States with the child. The mediation failed.

24. Nonetheless, Ms. May continued searching for jobs abroad and, in August, she received a job offer from a business in Boston. She accepted the offer in August and negotiated a start date of September 19, 2013.

25. Ms. May informed Mr. Mendez of the offer shortly after she received it.

26. In mid-August, Mr. Mendez and Ms. May renewed discussions about her relocating with the child. Specifically, in an August 13, 2013 Skype conversation, Ms. May and Mr. Mendez discussed relocating, and the parties discussed that Ms. May "just got a job" and was "moving in 3 weeks." Pet'r Ex. 19 at 001-003. Although the conversation devolved into recriminations at times, at other points, Mr. Mendez expressed an openness to consider relocating to Boston himself to be near the child. Id. at 005-008. No agreement was reached at this time.

27. They continued discussing the issue, however, meeting in person at least three times at restaurants in August and September before Ms. May left Argentina in the beginning of September. At these meetings, the parties discussed visitation arrangements if the child moved to Boston, who would pay for travel, and increased visitation for Mr. Mendez in the period before the child relocated to Boston.

28. These meetings culminated in a meeting in the beginning of September at which Mr. Mendez said C.F.F.M. could move to Boston after the end of the Argentinean school year in December.[3] In this meeting, Ms. May and Mr. Mendez also discussed the child

---

[3] Throughout the parties' conversations, Ms. May informed Mr. Mendez that she intended to relocate to the United States. In response to questions from the Court, Ms. May testified that, in the period of August and September of 2013, she was not planning to leave Argentina "forever" and stated that she told Mr. Mendez at one point that she was planning to leave Argentina for two years. The Court finds that Ms. May was planning to relocate generally, for an indefinite period, and that Mr. Mendez understood that. On August 14, 2013, Ms. May wrote that "ultimately he'll [the child] have a better life" in Boston. Pet'r Ex. 19 at 009. Ms. May's actions in orchestrating the move, heavily researching schools and neighborhoods, and causing her mother and possibly her father to relocate closer to Boston, are indicative

spending February, April, and summer vacations (on the American school calendar) with Mr. Mendez. During the period from September through December 2013, Ms. May and Mr. Mendez agreed that Mr. Mendez could increase his visitation to include Tuesday and Thursday evenings, so as to allow Mr. Mendez to spend additional time with the child before he left for the United States.

29. At this meeting, the parties did not (a) execute a signed travel authorization, (b) decide the exact date when the child would travel, although they understood it would be after the end of the Argentine school year, or (c) execute a new parenting agreement memorializing this arrangement.

30. At this meeting in early September, Ms. May and Mr. Mendez told C.F.F.M. of these plans.

31. Both Mr. Mendez and Ms. May understood at this time that the child could not leave the country without Mr. Mendez's written permission or a court order.

32. After these discussions, Ms. May left Argentina on September 9th or 10th to begin her job in Boston. After living in temporary housing, Ms. May settled in Roslindale, moving into an apartment in that neighborhood on November 15, 2013.

33. On September 16, 2013, Mr. Mendez sent to Ms. May an electronic copy of a document in Spanish that appears to be their 2009 agreement, along with a list of topics (in English and Spanish) for discussion and inclusion in a new agreement. These topics included medical insurance, holidays, birthdays, and costs, among others. Resp't Ex. 25. No party

---

of a permanent or indefinite move. Thus, despite any statements she may have made about the duration of time she and the child would live in the United States, her words and her actions indicated relocation for, minimally, an indefinite period. Furthermore, Mr. Mendez was apprised of all these actions, see Pet'r Ex. 21; Resp't Ex. 21; Resp't Ex. 24 at May_0016, and in response to Ms. May's statement that her parents were planning on moving closer to Boston, Mr. Mendez responded that this "is a situation of ne[v]er comming [sic] back." Pet'r Ex. 19 at 0010. He did not understand the relocation to have a shelf life of two years (or any other defined period).

provided a translation of the attachment. In the course of a brief back and forth email exchange regarding this document, Mr. Mendez told Ms. May "[w]e need to sign something we both agree [upon], but before [that] we need to work on a document." Id.

34. During the period after Ms. May left Argentina until the end of October, the child resided with Ms. May's mother, who ably cared for the child. During this time, Mr. Mendez routinely availed himself of the additional visitation on Tuesdays and Thursdays to which the parties had informally agreed while negotiating the child's relocation. Up to and through this period, Mr. Mendez had not complained about the actions of Ms. May's mother, who had relocated to Argentina in 2009 to assist Ms. May in providing child care for the child.

35. In an email dated September 30, 2013, Ms. May asked Mr. Mendez if he would "be ok with [the child] flying to the US with me after his birthday (before the holidays)?" Resp't Ex. 24 at May_0005. Mr. Mendez responded that he "would prefer if you can wait until he [the child] moves to you by the end of the year," and stated that he "really would like to spend the most amount of time with him [the child] before he moves." Id. After exchanging several emails which addressed this issue, Mr. Mendez wrote that he needed to consider different arrangements for the child to travel to the United States, but "[f]or now, what is sure is January the 8th," indicating a date on which he would allow the child to travel. Id. at May_0013. However, Mr. Mendez did not provide the required authorization despite his statement.

36. Later in that same email chain, Ms. May sent a list of "points" that would be incorporated into a new parenting agreement drafted by the parties' lawyers. Resp't Ex. 24 at

May_0016-17.  One of these "points" was that the child "will fly to Boston with you on January 8th."  Id. at May_0016.

37. In a Skype conversation on October 23, 2013, Ms. May expressed frustration at Mr. Mendez that he "had approx. 5 months to decide and sign something" but had not yet done so.  Resp't Ex. 26 at May_0463.  In this conversation, Mr. Mendez acknowledged his prior statements that the child could relocate to the United States, writing to Ms. May "[you] are still afraid . . . [that Mr. Mendez had not decided about relocation].  I have already made my mind . . . and comunicated [sic] [it] to you on [sic] the restaurant that time."  Id. at May_0467.  The "restaurant" is a reference to the meeting in September when Mr. Mendez stated that the child could relocate to the United States with Ms. May.

38. In this same conversation, Mr. Mendez also made clear that there were still unresolved issues relating to relocation, telling Ms. May that "we will have to agree on this somehow."  Resp't Ex. 26 at May_0465.  When Ms. May asked him if he would sign a document relating to the child's relocation, Mr. Mendez responded, "I do not know . . . what document [do] you want me to sign?"  Id. at May_0467.  With these statements and others, Mr. Mendez was using the fact that a signed authorization was required for the child to leave Argentina as leverage in his negotiations with Ms. May.  He was also withholding his agreement by not providing the travel authorization.

39. Also in that Skype conversation, Ms. May again raised the issue that she would "like [the child] to come with me after his birthday."  Resp't Ex. 26 at May_0465.  Mr. Mendez refused to agree to a December relocation, stating that the child leaving for the United States before the end of the year "makes no sense."  Id.  Further message exchanges resulted in a stalemate on that issue.

40. While still exchanging Skype messages, Ms. May sent an email to Mr. Mendez "giving [him] 30 days notice" that she was "elect[ing] to use [her] 45 days/year agreed to in the [2012 agreement] so that [the child] can fly to the US on December 4th." Pet'r Ex. 21. She did so intending to settle the disagreement and advance the date of the child's relocation to the United States to her preferred date in December.

41. In this email, Ms. May makes reference to Mr. Mendez "stalling" on signing a written agreement and notes frustration and disbelief at his claims that he had "more points" that he wanted to discuss. Pet'r Ex. 21.

42. There were no further cooperative conversations towards resolving the issues that divided the parties after the October 23, 2013 email.

43. After October 23, 2013, Mr. Mendez initiated several proceedings. These included numerous criminal proceedings for denial of visitation against Ms. May and Ms. May's mother. Pet'r Exs. 23, 27, 28. He also filed an emergency civil proceeding to obtain temporary custody of the child while Ms. May was in the United States. Resp't Ex. 30. These filings contained numerous false statements, including that Ms. May "went to live in the United States of America, without any notice" and "does not give her child any type of support or assistance." Resp't Ex. 30 at May_0091-92, 93.

G.    Court Proceedings in November and December

44. Ms. May returned to Argentina on November 28, 2013, and remained there until December 16, 2013.

45.  In response to the proceeding initiated by Mr. Mendez to obtain temporary custody, he and Ms. May attended a mediation on December 11 or 12, 2013.

46. At this point, Ms. May initiated a proceeding to obtain authorization to travel abroad for forty-five days pursuant to the 2012 agreement.

47. A hearing on Mr. Mendez's temporary custody proceeding was set for February 10, 2014.

48. On November 28, 2013, due to the various proceedings the parties had initiated, the judge presiding over the parties' family law matters prohibited the child from leaving Argentina and ordered immigration authorities in Argentina to prevent him from being taken from the country. Pet'r Ex. 26 at 003-004. Ms. May was aware of that order by December.

49. In the end of December, Ms. May returned to Argentina for a hearing on the criminal complaints filed by Mr. Mendez that alleged that Ms. May and Ms. May's mother denied Mr. Mendez visitation with the child. Although Mr. Mendez brought the criminal complaints, a criminal court judge (as distinct from the civil judge who was adjudicating the family law matters between the parties) reduced Mr. Mendez's visitation rights at the hearing. Subject to future adjustment by the civil judge, the criminal judge prohibited Mr. Mendez from having overnight visits with the child. Thus, at the end of each visitation day, Mr. Mendez had to return the child to Ms. May or her mother. The record before this Court does not reveal the reason for the criminal judge's Order barring Mr. Mendez from having overnight visitation with the child. Ms. May testified that the criminal judge restricted Mr. Mendez's visitation upon learning that he had included false statements in his complaints. Mr. Mendez provided no explanation for the Order.

H.    Events of February 2014

50. At some point in late December or early January, Ms. May returned to the United States. She returned to Argentina again on February 9, 2014.

51. The civil judge presiding over the parties' family law matters held a hearing on February 10, 2014 to address Mr. Mendez's temporary custody proceeding. At this hearing, the presiding judge also addressed Ms. May's filing to obtain the travel authorization. The permanent relocation of the child was not discussed at the hearing.

52. The judge did not rule on either of the filings at that time, but required the parties to meet together after the hearing to attempt to come to agreement on the travel authorization. At the hearing, the judge informed the parties that, if they could not come to agreement, he would make a decision before Ms. May's scheduled departure from Argentina on February 15, 2014. The parties did meet in a restaurant after the hearing, although they could not reach agreement on the travel authorization or any other matter. They informed the judge of this failure on February 10th or 11th.

53. After waiting several days for the judge to issue his decision on the travel authorization, Ms. May left Buenos Aires with the child and her mother on February 14, 2014. Ms. May denies having received a decision from the civil judge prior to leaving Buenos Aires on February 14th.

54. On February 14th, the civil judge released a decision denying Ms. May's request for travel authorization. Pet'r Ex. 31 at 001. The records from the court as to the date of the Order are equivocal; the Order displays date stamps of both February 14th and 20th. Id. Mr. Mendez's Argentinean lawyer who attended to his family law issues testified that she saw Ms. May and Ms. May's attorney in the corridors of the Buenos Aires courthouse on February 14th. Mr. Mendez's lawyer further testified that she received the decision on that day and that Ms. May was angry when they met in the corridor because of the court's decision denying authorization to travel.

55. This Court finds that Ms. May knew of the Argentine court's Order denying her request for travel authorization before she left Buenos Aires. Nonetheless, resolution of this point does not affect the outcome of this matter. Even without the decision denying travel authorization, Ms. May knew she was not entitled to take the child out of Argentina unless Mr. Mendez signed a specific travel authorization (which he had not) or the civil judge issued a court order authorizing the trip (which he had not). See Pet'r Ex. 15 (article written by Ms. May in 2012 stating that "[i]f I were to travel to the US with [the child] without permission, INTERPOL would come and get us. Yes, my US citizen son would be effectively DEPORTED back to Argentina.") (emphasis in original).

56. Nonetheless, on February 14th, Ms. May flew to Puerto Iguazú in Argentina, near the borders with Brazil and Paraguay, with her mother and the child. In that area, known as the triple frontier, the borders between all three nations are very close to each other.

57. Ms. May knew that the Argentinean border in this area was less regulated and thus might allow for an easier exit from Argentina for her and the child as compared with the airport in Buenos Aires.

58. On February 15th, Ms. May made three trips from Argentina into Brazil.

59. On the first trip, she crossed the land border to Brazil alone (leaving her mother and the child at a hotel in Argentina) and proceeded to the nearest airport in Brazil. There, she discovered that the child could not fly out of Brazil because he did not have a required visa. Ms. May then rented a car and returned to Argentina.

60. On the second trip, again traveling alone, Ms. May drove into Brazil and then onto Paraguay to ascertain if it would be possible for her and her son to fly out of Paraguay. Realizing that they could fly out of Paraguay, she returned to Argentina, through Brazil.

61. Finally, she made a third trip, this time with her mother and the child. At the border, she presented her and the child's Argentinean identity cards, but not their passports. They were allowed to pass through the border into Brazil. From there, they continued on to Paraguay.

62. Ms. May and the child flew out of Asuncion, Paraguay to the United States on February 16, 2014. Pet'r Ex. 33 at 003. Ms. May's mother returned to Argentina.

63. At the time Ms. May left Argentina, she was aware that she needed a signed writing from Mr. Mendez or a court order to leave the country with the child. She was also aware of the court order of November 28th, barring the child's exit from the country.

I.    <u>Events since Ms. May and the Child Left Argentina.</u>

64. Ms. May did not notify Mr. Mendez that she had left Argentina with the child. After trying to reach Ms. May, Mr. Mendez reached Ms. May's mother, who told him that Ms. May and the child were vacationing within Argentina. This statement was untrue.

65. Mr. Mendez learned that the child was no longer in Argentina when the child did not show up for his first day of school during the first week of March.

66. On March 2, 2014, Mr. Mendez tried to contact Ms. May to learn the whereabouts of the child by text message but received no response. Pet'r Ex. 34 at 005.

67. After an internet search, Mr. Mendez discovered Ms. May's work phone number and called Ms. May at her office in Boston. At that time, he confirmed that the child was in Boston.

68. After Mr. Mendez called Ms. May at work, Ms. May obtained an abuse prevention order from the Suffolk County Probate and Family Court.

69. Upon learning that the child had been removed from Argentina, Mr. Mendez notified the Argentine civil judge that Ms. May had left the country with the child and, on April 11, 2014, made a filing with the central authority in Argentina to pursue remedies under the Hague Convention. Pet'r Ex. 51. He also filed a criminal complaint for child abduction on March 7, 2014 with the Argentine police. Resp't Ex. 56. That offense carries a minimum mandatory sentence of five years and a maximum sentence of fifteen years, if convicted.

70. Since February 2014, the child has resided in Roslindale, a neighborhood in Boston, and has attended public school in Boston.

71. On July 15, 2014, the Argentine civil judge who presided over Ms. May and Mr. Mendez's family court proceedings issued an opinion that the child was wrongfully removed from Argentina under the Hague Convention and that the child's habitual residence at the time of the removal was Argentina. Pet'r Ex. 31 at 001, 003.

72. At Ms. May's direction and for the purposes of this litigation, the child met with and was observed by Dr. Scott Andrews, a child psychologist. Dr. Andrews provided a report in which he opined that there is a "grave risk that [the child's] return to Argentina would expose him to psychological harm." Resp't Ex. 41 at May_0324. In his testimony, however, Dr. Andrews clarified that the risk of harm arises not from return to Argentina per se, but only from the possible disruption of the bonds the child has formed with Ms. May, Ms. May's fiancé, and Ms. May's mother. Thus, his opinion on grave risk of harm is premised on separation from those individuals, and not from the return to Argentina itself.

II.     CONCLUSIONS OF LAW

The Hague Convention "secure[s] the prompt return of children wrongfully removed to or retained in any Contracting State," and "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Abbott v. Abbott, 560 U.S. 1, 8 (2010) (quoting Hague Convention, Art. 1).  Under Article 3 of the Hague Convention, removal of a child is wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.

A.     Prima Facie Case for Return under the Hague Convention

To establish that a child was wrongfully removed, Mr. Mendez bears the burden of showing, by a preponderance of the evidence, "that immediately prior to the removal: '(1) the child's habitual residence was the place to which the child's return is being sought, (2) the petitioner had custody rights over the child, and (3) the petitioner was exercising his or her custody rights.'"  Mauvais v. Herisse, 772 F.3d 6, 11 (1st Cir. 2014) (quoting Sanchez–Londoño v. Gonzalez, 752 F.3d 533, 540 (1st Cir. 2014)).  As set forth below, the Court finds that Mr. Mendez has established each of these elements of wrongful removal by a preponderance of the evidence.

1.     **Country of Habitual Residence**

The Hague Convention does not define the term habitual residence.  Mauvais, 772 F.3d at 11.  To determine the child's country of habitual residence, the Court looks primarily to "the

parents' shared intent or settled purpose regarding their child's residence . . . [however,] [a]s a secondary factor, 'evidence of a child's acclimatization to his or her place of residence may also be relevant.'" Id. (quoting Sanchez-Londoño, 752 F.3d at 540). The inquiry focuses on the child's habitual residence "immediately prior to the removal." Id. at 11 (quoting Sanchez-Londoño, 752 F.3d at 540).

Where the child in question is young, the focus is on "the shared intent or settled purpose of the parents, rather than the children, because young children 'lack[] both the material and psychological means to decide where [they] will reside.'" Id. at 12 (quoting Darin v. Olivero-Huffman, 746 F.3d 1, 11 (1st Cir. 2014)). Specifically, the Court looks to "the intent of the parents 'at the latest time that their intent was shared.' . . . as the wishes of one parent alone are not sufficient to change a child's habitual residence." Neergaard-Colon v. Neergaard, 752 F.3d 526, 531 (1st Cir. 2014) (quoting Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012)).

"Nevertheless, 'a child can lose its habitual attachment to a place even without a parent's consent . . . if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place.'" Darin, 746 F.3d at 11-12 (quoting Mozes v. Mozes, 239 F.3d 1067, 1081 (9th Cir. 2001)). This aspect of the habitual residence analysis acknowledges that "a child's life may become so firmly embedded in [a] new country as to make it habitually resident even though there be lingering parental intentions to the contrary." Id. at 12 n.14 (quoting Mozes, 239 F.3d at 1078).

It is undisputed that Argentina was the habitual residence of the child between his birth until September 2013. The child was born in Buenos Aires and lived in the city his entire life, initially with both parents and later with his mother, subject to visitation by his father. After

September and up to and including the time of removal, Mr. Mendez has established Argentina as the habitual residence of the child for at least two reasons.

First, changing the child's habitual residence required both parents to form a shared intent to abandon Argentina and to adopt the United States as the child's habitual residence. Although the parties came close to forming such a shared intent, they did not actually do so. There is no doubt that Mr. Mendez <u>stated</u> his agreement to the child moving to the United States. As a matter of fact, however, I find, based on the totality of the evidence, that he had not agreed, yet, and that he had not yet formed the intent to change the child's habitual residence. Both Ms. May and Mr. Mendez each knew that the child could not move, or even leave Argentina, without a signed writing from Mr. Mendez. The parties' discussions (orally and in writing) are replete with references to the necessary writing. Until Mr. Mendez signed the necessary authorization to remove the child from Argentina, the agreement, on the present facts, was not complete. Put another way, while Mr. Mendez was saying "yes," he was not taking the step necessary to give meaning to the statement. He was not taking that last step because he had not formed the intent to actually have the child abandon Argentina as the child's habitual residence and make the United States the new habitual residence.

Second, even if Mr. Mendez and Ms. May had formed a shared intent for the child to abandon Argentina as his habitual residence and adopt the United States as the child's habitual residence effective January 8, 2014, in light of the revocation of the agreement before the child left Argentina, the law, in such circumstances, does not recognize a change in the child's habitual residence. Although the analysis of habitual residence begins with the issue of shared parental intent, <u>Sanchez-Londoño</u>, 752 F.3d at 540, shared intent does not completely resolve the question. The First Circuit has noted "'a child can lose its habitual attachment to a place even

without a parent's consent . . . if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place.'" Darin, 746 F.3d at 11-12 (quoting Mozes, 239 F.3d at 1081). This allowance for the child's experience to create habitual residence is an acknowledgment that "[h]abitual residence is intended to be a description of a factual state of affairs." Id. (quoting Mozes, 239 F.3d at 1081). The Ninth Circuit, in Mozes v. Mozes, a case cited extensively by the First Circuit, held that "[w]hile the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone. . . . it requires an actual 'change in geography.'" Mozes, 239 F.3d at 1078 (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1402 (6th Cir. 1993)). No such change occurred here. The parties have cited no case—and the Court is aware of no case—where the First Circuit has found parental intent to be sufficient to change a child's habitual residence without the child's presence in the new country prior to removal or retention.[4]

Here, prior to the child's removal, he lived exclusively in Argentina from birth until shortly after his sixth birthday, not including limited trips abroad with his parents. Even assuming the parties formed a shared intent to relocate the child to the United States effective January 8, 2014, that shared intent cannot govern where the child was not relocated pursuant to

---

[4] Ms. May cites several cases from outside of the First Circuit for the proposition that a child can establish habitual residence in a country without being present in that country. One of those cases, MG v. WZ, No. V-23282-10, 2014 WL 5026267, at *2, 5 (N.Y. Fam. Ct. Sept. 30, 2014), is a wrongful retention case, where the parents reached a shared intent for the child to immigrate to the United States, followed by the consensual removal of the child from the Dominican Republic to the United States pursuant to that intent and does not stand for the proposition habitual residence can attach on the basis of shared intent alone, without the child's presence in the new country. The other two cases, Delvoye v. Lee, 329 F.3d 330, 332-34 (3d Cir. 2003), and Carlwig v. Carlwig (In re A.L.C. and E.R.S.C.), 16 F. Supp. 3d 1075, 1082-83 (C.D. Cal. 2014), involved mothers who traveled abroad for the purpose of giving birth, and the respective courts found the habitual residences of the newborns to be in the countries from which the mothers had arrived. The facts of those cases are sufficiently unique and different from the facts here— where the child is not a newborn and, in fact, passed the first six years of his life as a resident of Argentina—that, on the facts of this case, they do not support finding a new habitual residence on the basis of shared intent alone, without the child's presence. See Mozes, 239 F.3d at 1078.

that intent and "the objective facts point unequivocally" to Argentina as the child's country of habitual residence.  See Darin, 746 F.3d at 11-12.

2.      **Petitioner's Custody Rights**

The Hague defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, Art. 5(a).  In contrast, the Hague Convention defines "rights of access" to include "the right to take a child for a limited period of time to a place other than the child's habitual residence."  Hague Convention, Art. 5(b).  Custody is determined by the law of country in which the child was habitually resident.  Hague Convention, Art. 3(a); see Whallon v. Lynn, 230 F.3d 450, 456 (1st Cir. 2000).

The Supreme Court in Abbott v. Abbott, 560 U.S. 1, 15 (2010), held that a ne exeat right—the right of a parent to consent before a child is removed from the country—is a right of custody as that term is defined by the Hague Convention.  This holding in Abbott disposes of the right of custody issue in this case.  Article 264 of the Argentinean Civil Code states that in the case of a child born out of wedlock who is acknowledged by both parents "the express consent of both parents is required for the following acts: . . . [to] [a]uthorize the child to leave the Republic."  Pet'r Ex. 3 at 001, 003.  This is so regardless of the vesting of guardianship in one parent.  See id. at 001.  Further, both parties' experts testified that, under Argentinean law, a child born out of wedlock who has been acknowledged by his or her father cannot relocate outside of Argentina without the father's permission or a court order.

Although the agreements between the parties required Mr. Mendez to give authorization for vacation travel outside of Argentina, neither those agreements, nor any decision by the Argentine courts, stripped Mr. Mendez of his right to prevent the child from leaving Argentina

for any period longer than forty-five days, which obviously includes the right to prevent the permanent relocation of the child out of the country. Accordingly, Mr. Mendez possessed the power to prevent the child from permanently residing outside of Argentina, and, therefore, he had the requisite custody rights to establish wrongful removal under the Hague Convention. See Abbott, 560 U.S. at 11-14.

      3.    **Petitioner's Actual Exercise of his Custody Rights**

The Hague Convention does not define what constitutes the "actual exercise" of custody rights. Krefter v. Wills, 623 F. Supp. 2d 125, 133 (D. Mass. 2009). Nonetheless, courts have only found failure to exercise custody rights on the part of someone with such rights where there were actions "that constitute[d] clear and unequivocal abandonment of the child." Id. at 134 (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996) and noting the broad acceptance of the approach set out in that case). Thus, courts "liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich, 78 F.3d at 1065; see also Baxter v. Baxter, 423 F.3d 363, 370 (3d Cir. 2005) ("the test for finding the non-exercise of custody rights under the Hague Convention is stringent").

Here, Mr. Mendez was actively involved in the upbringing of the child, maintaining regular visitation with the child and being involved with his schooling, health, and general well-being. In addition, he participated actively in the discussions in 2013 regarding relocation and consistently and actively asserted his rights in those discussions. No more is needed to establish exercise of custody rights under the Hague Convention.

B.     Affirmative Defenses to Return

Having found that Mr. Mendez has established his prima facie case for return, the burden shifts to Ms. May to establish that an exception to return applies. 22 U.S.C. § 9003(e)(2). The exceptions, which allow a court to decline to order the return of a child, are "'narrow' and must be narrowly construed." Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) (quoting 22 U.S.C. § 9001(a)(4) and Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Dep't of State Mar. 26, 1986)). Ms. May contends that Mr. Mendez's consent and acquiescence to the child's removal and the grave risk of psychological harm or placing the child in an intolerable situation should preclude return of the child to Argentina.[5]

1.     **Consent**

Article 13(a) of the Hague Convention allows a court to refuse to return a child where the petitioning parent "ha[s] consented to . . . the removal or retention." Hague Convention, Art. 13(a). Ms. May bears the burden of proving that this exception applies by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). In adjudicating a consent defense, the Court looks to "the petitioner's conduct prior to the contested removal or retention." Darin, 746 F.3d at 14 (quoting Baxter, 423 F.3d at 371). Further, "[c]onsent may be evinced by the petitioner's statements or conduct . . . [and] the nature and scope of the petitioner's consent—including any conditions or limitations—should be taken into account." Id. at 15. Consenting to the child

---

[5] Before the hearing on the Petition, Ms. May indicated her intention to raise the affirmative defense of the objections of the child to return. In light of this position, the Court informed the parties that, if it were to take the child's testimony, it would do so in camera. At the hearing, however, Ms. May declined to call the child to testify and has not pursued this defense in her post-hearing filings. Accordingly, the Court does not consider this argument.

leaving the country for a limited period of time does not equate with consenting to the child's permanent relocation to another country. See Nicolson, 605 F.3d at 106.

Here, Ms. May argues that Mr. Mendez agreed to permit the child to relocate in the third meeting in the restaurant before Ms. May left for Boston and that consent, once given, may not be revoked. The evidence does establish that Mr. Mendez said in September that the child could relocate in January. But the parties did not reach agreement—that is, Mr. Mendez had neither signed the necessary travel authorization nor taken the child from Argentina to the United States.[6] As a matter of fact, Mr. Mendez's consent was incomplete in the absence of either of those two actions.[7] Put another way, Mr. Mendez did not actually consent.

For these reasons, the Court finds that Ms. May has not established by a preponderance of the evidence that Mr. Mendez consented to the removal of the child to relocate to the United States.[8]

---

[6] Ms. May cites contract law principals in support of her contention that Mr. Mendez's statement was enforceable notwithstanding the lack of a signed writing and the existence of unresolved issues. Whether Ms. May could have enforced Mr. Mendez's statement in a breach of contract action in Argentina is not a matter for this Court to decide. In determining whether a parent consented to the removal of the child, however, the First Circuit instructs courts to take into account "[w]hat the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent—including any conditions or limitations." Darin, 746 F.3d at 15. Here Mr. Mendez contemplated signing a document to complete his consent but he did not do so.

[7] This is not to say that, as a matter of law, Mr. Mendez had to take one of those two actions in order to consent, but rather that, in this case, Mr. Mendez did not in fact complete his consent based upon the facts before the Court.

[8] Even if Mr. Mendez had consented—and the Court does not so find—the Court would find that Mr. Mendez revoked his consent well before the consent became operative. The Court acknowledges that some courts applying the Hague Convention have found that consent, once given, may not be revoked. See, e.g., Cascio v. Pace, 992 F. Supp. 2d 856, 866 (N.D. Ill. 2014). The parties have cited no case where a court has found an attempted revocation of consent to be ineffective where the revocation was made well before the child leaves the country. In any event, even if the Hague Convention does not allow for revocation of consent after it is given, the Court would, as a matter of discretion, nonetheless order the return of the child notwithstanding that consent. See McManus v. McManus, 354 F. Supp. 2d 62, 68 (D. Mass. 2005); see also Yaman v. Yaman, 730 F.3d 1, 16 (1st Cir. 2013) (citing Asvesta v. Petroutsas, 580 F.3d 1000, 1004 (9th Cir. 2009), cert. denied, 134 S. Ct. 1874 (2014)). Ms. May removed the child while in the midst of family law proceedings in Argentina regarding her custody of the child and her authority to remove the child from Argentina in an effort to dictate the resolution of these matters. "The

2.      **Acquiescence**

Article 13(a) of the Hague Convention also allows a court to decline to return a child where the petitioning parent has "subsequently acquiesced in the removal or retention."  Hague Convention, Art. 13(a).  As with consent, Ms. May bears the burden of proving that this exception applies by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2)(B).  The relevant inquiry for the acquiescence defense is "whether the petitioner subsequently agreed to or accepted the removal or retention."  Darin, 746 F.3d at 14 (quoting Baxter, 423 F.3d at 371).  A finding of acquiescence requires more formal conduct than would allow for a finding of consent, as examples, the First Circuit has pointed to "testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time."  Id. at 16.

In this case, the evidence does not support a finding of acquiescence.  In fact, the evidence shows that, almost immediately upon learning of the child's removal, Mr. Mendez consistently sought to locate and obtain the return of the child.  These steps included contacting several people to determine the child's whereabouts, notifying the civil courts in Argentina of the child's removal, filing a criminal complaint for child abduction, and taking the necessary steps to file a petition pursuant the Hague Convention.  At no time after removal has Mr. Mendez's conduct demonstrated agreement to or acceptance of the child's removal.  The conduct cited by Ms. May, terminating child support payments and not appearing to contest an abuse prevention order in Suffolk County Probate and Family Court, simply is not indicative that Mr. Mendez

---

Convention should not be interpreted to permit a parent to select which country will adjudicate these questions by bringing the child to a different country, in violation of a ne exeat right."  Abbott, 560 U.S. at 21; see also 22 U.S.C. § 9001(a)(2).

acquiesced in the removal, whether considered separately or together with the aforementioned conduct. Accordingly, Ms. May has failed to establish acquiescence.

### 3. Grave Risk of Psychological Harm or Intolerable Situation

Under Article 13(b) of the Hague Convention, a court may refuse to return a child where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). Ms. May must establish that this exception applies by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Subsidiary facts, however, may be shown by a preponderance of the evidence. Yaman v. Yaman, 730 F.3d 1, 11 (1st Cir. 2013), cert. denied, 134 S. Ct. 1874 (2014).

"[G]rave" means a more than serious risk, but it need not be an immediate risk." Charalambous v. Charalambous, 627 F.3d 462, 467 (1st Cir. 2010). The grave risk of harm exception localizes the inquiry on the effect on the child; harm to others is only considered insofar as it bears on the risk of harm to the child. Id. at 468. However, "[t]he Article 13(b) defense may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Dep't of State Mar. 26, 1986)). Further, a court is to disregard "arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States [as that] is an inevitable consequence of removal." Walsh v. Walsh, 221 F.3d 204, 220 n.14 (1st Cir. 2000).

"A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings. Id. at 219. "The undertakings approach allows courts to conduct an evaluation of the placement options and

legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." Id.

Ms. May argues that returning the child to Argentina presents a grave risk of psychological harm and would place the child in an intolerable situation. Ms. May makes two contentions in this regard. First, she argues that because of the criminal child abduction complaint filed by Mr. Mendez against her in Argentina—which carries a penalty of imprisonment for five to fifteen years—there is a grave risk that she would be separated from the child for an extended period of time. She supports this argument with the testimony of Dr. Scott Andrews, a child psychologist who offered his opinion that severing the child's relationships with Ms. May, Ms. May's fiancé, and Ms. May's mother would expose the child to a grave risk of psychological harm.[9]

Insofar as Ms. May is arguing that the grave risk arises from the separation from the child due to her inability to return to Argentina, she has not established that she is unable to return to the country. There is no evidence before the Court that she has been formally charged with a criminal offense related to removing the child from Argentina, as distinct from Mr. Mendez lodging a complaint. There is no evidence that a warrant has issued for her arrest. The prior history of criminal complaints related to the parties in this case, albeit regarding lesser matters such as the denial of visitation, suggests that criminal proceedings are dismissed upon resolution of the underlying family law matter. Moreover, Mr. Mendez's expert provided uncontroverted testimony that, in her many years of experience with Hague Convention proceedings in Argentina, she was unaware of any parent who had been actually prosecuted for kidnapping or

---

[9] As noted above, although Dr. Andrew's report speaks of the risk of psychological harm arising from the child's return to Argentina, Resp't Ex. 41 at May_0324, in his testimony he clarified that the risk arises only from the severance of bonded relationships independent of the child's return to Argentina.

child abduction after removing a child from Argentina. In other words, whether the child suffers a grave risk of psychological harm due to separation from Ms. May arises not from the return of the child to Argentina, but whether or not Ms. May elects to stay in Argentina with the child.

Second, Ms. May argues that, if returned, the child would be placed in an intolerable situation for several different reasons. She argues that the child will suffer racist treatment if returned to Argentina and testified about several comments and situations occurring in Argentina that displayed racial bigotry or insensitivity, such as schoolmate telling the child that he could not go to a birthday party because he was black and the use of "blackface" in public school plays. Although the Court does not condone any of the actions described, a small number of unrelated, nonviolent incidents of bigoted speech or behavior—several of which were attributed to small children—does not rise to the level of an intolerable situation, considering that the exceptions to return are to be narrowly construed. See Danaipour, 286 F.3d at 14. Moreover, nothing in the record suggests that these incidents were of such significance to Ms. May that they caused her to remove the child from Argentina for that reason.

Ms. May further argues that an intolerable situation would arise from the media coverage of this case in Argentina. There was testimony that Mr. Mendez petitioned the Argentine government to provide financial assistance in prosecuting his Hague petition. Mr. Mendez testified that his online petition was widely circulated, and, in furtherance of his petition, he gave three interviews to television journalists and three interviews to print journalists. The evidence also suggests social media or internet interest in this case in Argentina. This evidence fails to establish an intolerable situation. Nothing about the evidence suggests that the public attention will continue after the child's return or that any such media attention would cause any adverse consequences to the child directly or indirectly. In addition, Ms. May herself placed the child in

the public eye in a June 2012 article she authored entitled "Zen and the Art of Being Trapped in a Foreign Country," which appeared in an online magazine and described some of the travails of the parties' relationship. Pet'r Ex. 15.

Finally, Ms. May argues that, if returned, the child will placed in an intolerable situation due to Mr. Mendez's prior verbal abuse and harassment of Ms. May. There are neither allegations of, nor evidence of, verbal or physical abuse of the child by Mr. Mendez. There is some evidence of Mr. Mendez mistreating Ms. May with physical abuse on two occasions and verbal abuse on other occasions, with some of the verbal abuse and one instance of physical abuse occurring in front of the child. The physical abuse alleged occurred twice over the course of seven years, with both incidents occurring more than two years prior to removal. At this point, occasions for interaction of the parties in front of the child are limited, and thus the opportunities for harm to come to the child by observing abuse of Ms. May are similarly limited. The Argentinean courts, if necessary, can control such interactions in front of the child. Accordingly, Ms. May has not established that return will place the child in an intolerable situation. For these reasons, the Court finds that Ms. May has not established by clear and convincing evidence that the child would be exposed to a grave risk of psychological harm or an intolerable situation if returned to Argentina.

One further issue bears mention in closing. In 2013, Ms. May pursued a relocation and ultimately did move to the United States at least in part because, in her opinion, it offered her substantially better economic opportunities (prior to the move, Ms. May's work in Argentina had withered due to recession, and in August she obtained a job in Boston paying $88,000 per year) and a better life for her and her child. By its decision, the Court is not determining that the child must live solely in Argentina, only that the Court in Argentina, and not Massachusetts, must

resolve the decisions upon which the parents cannot agree, such as whether the child resides in the United States or Argentina, or both.

III.    <u>CONCLUSION</u>

For the reasons set forth above, the Courts GRANTS the Petition and ORDERS the return of the child, C.F.F.M., to Argentina within thirty days of this Order.  The parties shall file a report with the Court no later than January 23, 2015 that sets forth the parties' joint plan to return the child to Argentina, which is to include the date of travel, the flight number, and the adult with whom the child will travel.  If the parties cannot agree on arrangements for return, they shall file a joint report on that date containing their respective proposals for the child's return.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge